UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MELISSA CONRAD, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:21-cv-10788-IT |
| | * | |
| KILOLO KIJAKAZI, Acting Commissioner | * | |
| of Social Security,[1] | * | |
| | * | |
| Defendant. | * | |

<u>MEMORANDUM & ORDER</u>

March 31, 2023

TALWANI, D.J.

Plaintiff Melissa Conrad seeks judicial review of the final decision by Defendant Commissioner of Social Security ("Commissioner") denying her claim for Social Security Disability Income ("SSDI"). Mot. to Reverse the Commissioner's Decision ("Mot. Reverse") [Doc. No. 16]. The Commissioner moves to affirm the final decision. Mot. to Affirm the Commissioner's Decision ("Mot. Affirm") [Doc. No. 19]. For the following reasons, Conrad's Motion to Reverse the Decision of the Commissioner [Doc. No. 16] is GRANTED IN PART and DENIED in PART and the Commissioner's Motion to Affirm the Commissioner's Decision [Doc. No. 19] is DENIED where the action is REMANDED for further consideration of absenteeism with respect to pre-December 31, 2015 period.

---

[1] The court substitutes Acting Commissioner Kilolo Kijakazi for former Commissioner Andrew Saul as Defendant. <u>See</u> Fed. R. Civ. P. 25(d).

## I.      Procedural Background

On March 16, 2017, Conrad submitted to the Social Security Administration an SSDI application, alleging a disability onset date of January 1, 2013. Administrative Record ("A.R."). 16 [Doc. No. 15-2]. On October 13, 2017, Conrad filed a written request for a hearing on her SSDI application. Id.

On November 7, 2017, Conrad filed a Supplemental Security Income ("SSI") application, which was escalated to the hearing level. Id. On March 1, 2018, an ALJ dismissed Conrad's SSDI application and, since the agency failed to consider Conrad's allegations of disability after her date last insured,[2] remanded her SSI application for initial and reconsideration level medical determinations. A.R. 74–75 [Doc. No. 15-3]. Conrad's SSI claims were denied on November 5, 2018. Id. at 76–91.

On January 18, 2019, Conrad sought reconsideration of the denial of her SSI application. A.R. 138–140 [Doc. No. 15-4]. That same day, Conrad filed a second SSDI application, alleging that her onset of disability was January 1, 2013. A.R. 118 [Doc. No. 15-3]. Conrad's SSDI claims and reconsidered SSI claims were denied on July 8, 2019. A.R. 141–146 [Doc. No. 15-4]. Conrad requested a hearing, which was held before an ALJ on July 6, 2020. A.R. 41–70 [Doc. No. 15-2]. In an August 5, 2020 decision, the ALJ found in relevant part that Conrad was not disabled within the meaning of the Social Security Act prior to November 7, 2017 (meaning that Conrad was not disabled through December 31, 2015, her date last insured), but that Conrad became disabled on November 7, 2017 (the earliest allowable onset date for her SSI application).

---

[2] To be eligible for SSDI benefits, a claimant must be "insured for disability" at the time she became disabled based on previous earnings history. A claimant is insured for disability in any quarter in which he was fully insured and had "at least 20 [quarters of coverage] in the 40-quarter period . . . ending with that quarter." 20 C.F.R. § 404.130(b).

Id. at 30–31. Thus, Conrad's SSDI application for the pre-December 31, 2015 period was denied and Conrad's SSI application for the post-November 7, 2017 period was granted.

Conrad requested review of the portion of the ALJ's decision denying her SSDI, and the Social Security Administration Appeals Council denied her request on March 10, 2021, making the ALJ's decision the final decision of the Commissioner in this case. Id. at 1–4.

## II.     Age, Education, and Work History

Conrad was fifty years old in 2017 when she submitted her initial application for disability benefits; she has a high school education; and she previously worked as a daycare teacher. Id. at 48–49, 51. Conrad's last employment was in 2013. A.R. 254 [Doc. No. 15-6].

## III.     Medical Evidence Provided to the ALJ[3]

In her Adult Disability Report dated July 28, 2018, Conrad lists chronic obstructive pulmonary disease ("COPD"), sleep apnea, chronic migraines, chronic fatigue, hip and leg pain, and depression and anxiety as conditions that limited her ability to work as of January 1, 2013. Id. at 265. A summary of Conrad's evidence of these impairments, as well as other impairments, for the pre-December 31, 2015 period, is as follows.

A.     *Chronic Obstructive Pulmonary Disease ("COPD") and Sleep Apnea*

During multiple doctor's visits in 2013, the medical records indicate that Conrad was taking ProAir HFA, Spiriva, Advair, and Montelukast for her COPD and should continue to do so. A.R. 1521, 1526, 1542 [Doc. No. 15-10]. On October 20, 2014, and April 28, 2015, Conrad was seen for her COPD by Dr. Chris Kapogiannis, an internal medicine, critical care medicine,

---

[3] Conrad stipulates that the ALJ's decision "fairly and accurately summarized the material medical evidence, consultative examinations and state agency opinions . . . To the extent that [Conrad] disagrees with the ALJ's summary of the evidence of record, [she] identifies such discrepancies in [her] argument." Pl.'s Mem. 3 [Doc. No. 16].

sleep medicine and pulmonary disease doctor. A.R. 1713, 1725 [Doc. No. 15-11]. During the first visit he noted that Conrad's COPD was stable and that she should maintain her current medical regimen, and during the last visit he confirmed that she should continue with her current medication regimen. Id.

Dr. Kapogiannis also saw Conrad on November 10, 2014. Id. at 1892. He noted that she was diagnosed with sleep apnea at some point after September 2012, but that Conrad is using a continuous positive airway pressure ("CPAP") machine nightly and "is sleeping better" and "[h]er energy level is much better." Id. Dr. Kapogiannis reported that Conrad is "quite well with [the CPAP machine]." Id.

B.   *Migraine and Chronic Pain Syndrome*

During a February 2013 visit, Dr. Win, an internal medicine doctor at Greater New Beford Community Health Center, noted that Conrad had been to the emergency room multiple times for migraines and headaches. A.R. 1537 [Doc. No. 15-10]. On April 18, 2013, Conrad received an occipital nerve root block for her chronic pain syndrome relating to headaches, which had no effect. Id. at 1395. On October 31, 2013, Conrad received a cranial Botox injection to treat her headache and migraine pain. Id. at 1392.

On November 15, 2013, Conrad was seen by Dr. Allison Gorski, a pain medicine specialist at the Southcoast Health Pain Center ("Pain Center"), for migraine and headache pain that had not improved after the nerve root block or Botox injection. A.R. 1763 [Doc. No. 15-11]. During this visit, Conrad noted that her pain was an 8 out of 10 in intensity but was improved by steroid injections. Id. Dr. Gorski also noted that Conrad's occipital neuralgia and migraine aura issues are treated with the same treatments as her migraine/headache and chronic pain syndrome. Id. at 1764.

On February 13, 2014, Conrad received her second cranial Botox injection for headache and migraine pain. A.R. 1392 [Doc. No. 15-10]. On April 8, 2014, Dr. Bruce Abbot from the Southcoast Health System Brain and Spine Center indicated that Conrad's headaches had "substantially improved" after two rounds of Botox injections and a combination of Dilaudid, Perphenazine, Venlafaxine and Amitriptyline medication for the pain. A.R. 1740 [Doc. No. 15-11]. On July 18, 2014, Conrad received an occipital nerve root block for her chronic pain syndrome and related migraine issues. A.R. 1395 [Doc. No. 15-10]. On July 24, 2014, Conrad received her third cranial Botox injection for headache pain. Id.

On September 16, 2014, Conrad visited the Pain Center for management of her chronic pain syndrome related to her headaches. Id. at 1390. During this visit, she explained that she experienced fourteen headaches a month lasting longer than four hours at a time, and that she had had a headache for the past nine days straight. Id. The medical notes indicate that Conrad's occipital neuralgia and migraine aura were being managed with the same treatments as the treatments for her headaches and migraines. Id. at 1391. On October 12, 2014, Conrad received a CT scan of her head which revealed "no acute intracranial pathology." Id. at 1578. On October 30, 2014, Conrad received her fourth cranial Botox injection for headache and migraine pain management. Id. at 1392.

On November 7, 2014, Conrad saw a physician's assistant for a follow-up visit on her chronic pain syndrome related to headaches and migraines. Id. at 1392–93. At this visit, Conrad indicated that the Botox injections had caused a 50% improvement in the intensity and frequency of her headaches and that her current pain was 6 out of 10 in intensity, but that she had gone to the emergency room for headache pain twice in October and once in September 2014. Id.

On January 15, 2015, Conrad received her fifth cranial Botox injection for headache and migraine pain. Id. at 1395. On February 27, 2015, Conrad returned to the Pain Center to follow up on the headache issues because she was not responding well to the January Botox injection. Id. A month later, Conrad again followed up at the Pain Center and noted that her headaches were gradually worsening and had begun to occur three to four times a week. Id. During the month of April 2015, Conrad went to the emergency room three times for headache pain. Id. at 1405.

On April 23, 2015, Conrad received her sixth cranial Botox injection for headache and migraine pain. Id. at 1401. During May 2015, Conrad went to the emergency room twice for headache pain. Id. at 1405. On a May 27, 2015 follow-up visit with the Pain Center, Conrad reported that the Botox injections decreased her headache intensity by 50%. Id. at 1402. However, on June 8, 2015, Conrad again reported that her headaches were worsening, causing photophobia, nausea, and vomiting, becoming more frequent, and that she had again gone to the emergency room for the pain. A.R. 1793 [Doc. No. 15-11]. On June 22, 2015, Conrad went to the emergency room for headache pain. A.R. 1405 [Doc. No. 15-10]. On June 24, 2015, Conrad followed up with the Pain Center regarding increased headache pain, this time reporting pain levels of 8 out of 10 in intensity. In response to this pain, doctors increased her medication. Id.

On July 14, 2015, Conrad received her seventh cranial Botox injection for her migraine and headache pain. Id. at 1408. On July 22, 2014, Conrad went to the emergency room for headache pain. Id. at 1409. At an August 12, 2015 follow-up visit at the Pain Center, Conrad reported that her headache intensity had improved since her last emergency room visit. Id. at 1408.

On October 6, 2015, Conrad received her eighth cranial Botox injection for headache pain. Id. at 1412. At an October 9, 2015 visit with Dr. John Stamoulis, a neurologist, Conrad reported that her headaches had improved and were only occurring about three times per month. A.R. 1795 [Doc. No. 15-11]. Conrad went to the emergency room twice for headache pain in October and three times in November 2015. A.R. 1412 [Doc. No. 15-10]. However, on November 24, 2015, Conrad noted that the cranial Botox had improved her headaches. Id. On December 5, 2015, Conrad went to the emergency room for headache pain. A.R. 1797 [Doc. No. 15-11]. On December 23, 2015, Conrad was seen by Southcoast Health's Neurology Department for her headaches, which she reported caused "10/10" pain levels and occurred three to four times a week and over ten times a month, lasting for hours at a time. Id.

On December 29, 2015, Conrad received her ninth cranial Botox injection for migraine pain. A.R. 1418 [Doc. No. 15-10].

C.    *Edema*

On January 14, 2013, Conrad saw Nurse Practitioner Kara Moran for swelling in her feet that lasted three days and that was not relieved by elevation. Id. at 1546. Moran's general examination notes show a diagnosis of "trace pedal edema," to be treated with low salt intake and feet elevation, and that Conrad was advised on weight loss and smoking cessation. Id. at 1548–49. Two weeks later, Conrad visited Dr. Levy Ansaldo for swelling in both of her feet. Id. at 1542. Dr. Ansaldo's treatment notes provided for leg elevation and labs to better diagnose the issue. Id. at 1545. On June 26, 2013, Conrad was seen for edema and was prescribed furosemide. Id. at 1522. Dr. Win's notes from a visit on July 1, 2013, conclude that the edema had been resolved. Id.

Between November 2013 and September 2015, Conrad's medical records indicate that she visited Dr. Win five times, continued the furosemide prescription, and that her extremities showed no edema. Id. at 1520, 1618, 1622, 1624, 1628, 1634, 1646–47.

D.    *Depression/Anxiety*

Between February 2013 and June 2014, notes from four of Conrad's doctor's visits state that she suffered from depression with anxiety but generally that her condition was stable and being treated with medications. Id. at 1520–21, 1539–40, 1646–47; A.R. 1748–49 [Doc. No. 15-11]. On June 22, 2015, Dr. Win suggested that Conrad receive psychological counseling, but Conrad declined. A.R. 1628 [Doc. No. 15-10]. On September 30, 2015, Dr. Win again offered to connect Conrad with psychological counseling, which Conrad declined. Id. at 1622.

E.    *Chest/Pain*

On March 2, 2013, upon the order of Dr. Win, Conrad received a sonogram of her abdomen for epigastric pain (pain/discomfort below the ribs), which showed no specific diagnoses. A.R. 1670 [Doc. No. 15-11].

A week later, Conrad was admitted to St. Luke's Hospital with chest pain, which she rated to be an 8 out of 10 in intensity. Id. at 1777. Dr. Win ordered an x-ray of Conrad's chest and concluded that the pain was either costochondritis (inflammation of the cartilage that connects the ribs to the sternum) or worsening of her acid reflux. Id. at 1778, 1780. On the following day, while Conrad was still admitted, Dr. Win consulted with cardiology about Conrad's chest pain, and cardiology concluded that she was clinically stable. Id. at 1750.

Between March 15 and May 3, 2013, Dr. Win ordered five chest x-rays due to Conrad's ongoing chest pain, none of which revealed any conclusive cause of the pain. Id. at 1664–68.

8

On June 9, 2013, Conrad was admitted to the hospital for chest pain and Dr. Win ordered an x-ray for her chest, which again did not reveal any conclusive cause of the pain. A.R 1522 [Doc. No. 15-10]; A.R. 1661 [Doc. No. 15-11]. The following day, Dr. Nosheen Javen, a cardiologist, examined Conrad and noted that three stress tests were inconclusive and that they suspected the pain was noncardiac related. A.R. 1751–52 [Doc. No. 15-11]. On June 11, 2013, Dr. Win ordered a CT scan of Conrad's chest, which revealed dependent atelectasis (a complete or partial collapse of the entire lung or an area of the lung). Id. at 1662.

On October 27, 2013, Dr. Win ordered a chest x-ray due to Conrad's "left-sided chest pain," which revealed no significant changes from previous scans. Id. at 1658.

On November 11, 2013, Conrad was seen at New Bedford's Internal Medicine and Cardiology unit for localized chest pain, where she was referred to a gastrointestinal doctor to explore whether the issue was related to a hiatal hernia. Id. at 1753–1756. A month later, Conrad was seen by Dr. Christian Campos, who remained uncertain as to whether the pain was related to a hiatal hernia or acid reflux. Id. at 1757. At that visit, Dr. Campos ordered a barium swallow to obtain more information regarding the cause of Conrad's pain. Id. On January 8, 2014, Conrad was seen by Dr. Campos again, who noted that Conrad's symptoms were stable and that she had elected to continue with "present conservative treatment." Id. at 1743.

On April 21, 2014, Conrad received an x-ray and CT scan for chest pain, which revealed no evidence of pulmonary embolism (a blood clot). A.R. 1590–91 [Doc. No. 15-10]. Two days later, Conrad was admitted to the hospital with chest pain, and received an x-ray that revealed no significant changes. Id. at 1586; A.R. 1735–36 [Doc. No. 15-11].

On June 28, 2014, Dr. Campos assessed Conrad again and noted that her condition remained "essentially unchanged" since her last visit with him in January 2014. His notes

indicate that Conrad preferred to continue with conservative treatment since she felt "clinically stable." A.R. 1730, 1733 [Doc. No. 15-11].

On October 30, 2014, Conrad received a Botox injection to the xiphisternal junction, which is near the bottom of the septum, to help alleviate her chest pain. A.R. 1405 [Doc. No. 15-10].

On June 11, 2015, Conrad saw Dr. Win for her chest pain because it was occurring three times a week and sometimes twice a day. A.R. 1701 [Doc. No. 15-11]. On this visit, Dr. Win noted that the Botox injection to the xiphisternal junction helped with the pain, but its effect was starting to fade, and that Conrad should receive another injection. Id. at 1704. On July 13, 2015, Conrad received another Botox injection in her sternum, which she noted improved her pain by 100%. A.R. 1408 [Doc. No. 15-10].

On October 21, 2015, Dr. Win again examined Conrad for chest pain, noting that the injections were providing "good relief" and that she should continue to get injections. A.R. 1706, 1709 [Doc. No. 15-11]. On December 29, 2015, Conrad received a third Botox injection in her sternum. A.R. 1418 [Doc. No. 15-10].

F.   *Other Impairments*

On February 25, 2013, Conrad was seen by Dr. Ephraim Semah at the Greater New Bedford Community Health Center for abdominal pain, and Dr. Semah noted that Conrad went to the emergency room twice in the previous two weeks for that pain. Id. at 1536. Dr. Semah also indicated that this pain may have been related to gastritis and a hiatal hernia. See id., 1540.

On May 11, 2013, Dr. Win examined Conrad for persistent elbow pain that was not caused by any trauma but had been ongoing for three weeks. Id. at 1532. Dr. Win's notes describe the ailment as "tennis elbow." Id.

On September 20, 2013, an x-ray was taken of Conrad's right hand due to pain and swelling for three days. A.R. 1660 [Doc. No. 15-11]. On December 12, 2013, Conrad visited an orthopedic surgeon for a mass in her left hand that had lasted for a month. Id. at 1741.

On July 7, 2014, Conrad received an umbilical hernia repair. A.R. 1553 [Doc. No. 15-10].

Between May and September 2015, Conrad was seen by Dr. Win three times due to sudden and unintentional weight loss of 28 pounds from March to September 2015. Id. at 1618, 1622, 1628, 1630, 1633.

On December 9, 2015, Conrad received an x-ray of her hips due to hip pain that had lasted for about a month and had been getting worse as the day proceeds. Id. at 1612. Dr. Cathy Beland prescribed prednisone to help with the pain and recommended physical therapy. Id. at 1616.

### IV.   Standard of Review

Under sentence four of 42 U.S.C. § 405(g), a district court has the power to affirm, modify or reverse a decision of the Commissioner, with or without remanding the cause for a rehearing. The district court must make its decision based on the pleadings and transcript of the record before the Commissioner; when the Commissioner's findings are supported by "substantial evidence" and conform to relevant law, they are conclusive. See Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018); see also Rodrigues Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (court must affirm Commissioner's decision "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence").

Substantial evidence review is deferential; while "more than a scintilla of evidence is required to meet the benchmark, a preponderance of evidence is not." Purdy, 887 F.3d at 13

(internal quotations omitted). Substantial means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (internal citation and quotation omitted). However, the decision of the ALJ is "not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999). The court can reverse the Commissioner's final decision when the "underlying facts and law are such that the agency has no discretion to act in any manner other than to award or deny benefits." Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001). However, if a court reverses the Commissioner's decision but there is no clear entitlement to benefits based on the record before the court, the court must remand for further proceedings. Id. at 12 ("When an agency has not considered all relevant factors in taking action, or has providing insufficient explanation for its action, the reviewing court should ordinarily remand the case to the agency") (citation omitted).

An individual is considered disabled under the Social Security Act if he or she is "[unable] to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

Under the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled. See 20 C.F.R §§ 404.1520(a), 416.920(a).

> The hearing officer must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or medically equals an impairment listed under 20 C.F.R. Part 404, Subpart P, Appendix 1, and meets the duration requirement; (4) whether the claimant has the residual functional capacity to perform his past

relevant work; and (5) whether the impairment prevents the claimant from doing any other work considering the claimant's age, education, and work experience.

Sastre v. Astrue, 870 F.Supp.2d 267, 274 (D. Mass. 2012) (citing 20 C.F.R. § 416.920).

In the first four steps the claimant bears the burden to show he or she is disabled within the meaning of the Social Security Act. See Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001). "Once the claimant has established that he [or she] is unable to return to his former employment, the burden shifts to the Commissioner to prove the fifth step, that the claimant is able to engage in substantial gainful activity that exists in significant numbers in the national economy." Sastre, 870 F.Supp.2d at 274.

**V.      Discussion**

In her August 5, 2020 decision, the ALJ followed the five-step evaluation and concluded that Conrad was not under a disability within the meaning of the Social Security Act at any time from January 1, 2013, through December 31, 2015. A.R. 30 [Doc. No. 15-2]. In her Memorandum in Support of Reversing the Decision of the Commissioner [Doc. No. 16], Conrad argues that the ALJ committed reversible errors at Steps Two, Four, and Five. Pl.'s Mem. in Supp. of Reversing 6–9 ("Pl.'s Mem.") [Doc. No. 16].[4] The court addresses each of the challenged steps in turn.

A.      *Step Two – Severe Impairment*

At step two, the ALJ found that although Conrad had the severe impairments of osteoarthritis, migraines, depressive disorder, somatic disorder, carpal tunnel syndrome, and

_____

[4] At Step One, the ALJ concluded that Conrad had not engaged in any substantial gainful activity since January 1, 2013. A.R. 19 [Doc. No. 15-2]. At Step Three, the ALJ found that since January 1, 2013, Conrad did not have an impairment or combination of impairments severe enough to meet one of the listings. Id. at 20. Conrad does not challenge these findings.

asthma/COPD by November 7, 2017, Conrad's only severe impairment from January 1, 2013, through December 31, 2015, was migraines. A.R. 19 [Doc. No. 15-2]. Conrad contends that a remand is necessary because the ALJ did not properly consider her migraines in combination with her other impairments at Step Two and that such error is not harmless because it affected the ALJ's decision at later steps in the sequential analysis. Pl.'s Mem. 7 [Doc. No. 16]. Conrad further contends that it is unclear what evidence the ALJ considered when determining the existence of severe impairments at Step Two, and therefore it cannot adequately be concluded that the ALJ's decision is supported by substantial evidence. Id.

Defendant contends that "any challenge to the ALJ's step-two findings is misguided because the ALJ here moved past this step in the sequential evaluation." Def.'s Mem. in Supp. of Mot. Affirm ("Def.'s Mem.") 7 [Doc. No. 20] (internal citations omitted).

Step Two is meant to be a "de minimis screening device" for "groundless claims" and for "applicants whose impairments are so minimal that, as a matter of common sense, they are clearly not disabled." McDonald v. Sec'y of Health and Human Servs., 795 F.2d 1118, 1122–23 (1st Cir. 1986). "[A]s long as the ALJ [finds] at least one severe impairment so that the sequential evaluation progress[es] to the next step, an error at Step Two does not require reversal." Dunham v Astrue, 2013 WL 1192406, at *8 (D. Mass. March 21, 2013) (alterations in original) (internal citation and quotation omitted). "Thus, it follows logically that if the ALJ resolved Step Two in an appropriate manner, then reversal or remand on that ground would be unnecessary." Id. This is because once the ALJ finds any severe impairment, when residual functional capacity is calculated at Step Four, the ALJ must consider the limitations imposed by all impairments, regardless of their severity. Valle v. Berryhill, 444 F.Supp.3d 299, 310 (D. Mass. 2020); see also Noel v. Astrue, 2012 WL 2862141, at *6 (D. Mass. July 10, 2012) (finding

potential Step Two error harmless because the ALJ took both severe and non-severe impairments into consideration when assessing residual functional capacity).

Accordingly, the court finds that no error requiring reversal occurred at Step Two.[5]

B.  *Step Four – Residual Functional Capacity*

At Step Four, the ALJ found, in relevant part, that from January 1, 2013, through December 31, 2015, Conrad:

> had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations. She would be able to understand, remember, and carry out simple and routine instructions for 2 hour intervals over the course of an 8-hour workday and 40 hour workweek. She could adapt to routine changes in work environments. She must avoid concentrated exposure to noise.

A.R. 22 [Doc. No. 15-2]. Conrad contends that the ALJ did not properly consider all of her impairments when determining her residual functional capacity for the pre-December 31, 2015 period. Pl.'s Mem. 6–8 [Doc. No. 16]. Specifically, Conrad contends that the ALJ failed to provide clear and specific reasons for (i) discounting Conrad's testimony regarding her pain and impairments in determining her residual functional capacity; (ii) finding that Conrad's other impairments would not further limit her residual functional capacity; and (iii) finding that evidence implying potential absenteeism and its effect on Conrad's ability to retain full-time employment should not be considered. Id. at 8.

"[T]he ALJ's findings shall be conclusive if they are supported by substantial evidence, and must be upheld if a reasonable mind, reviewing the evidence in the record as a whole, could

---

[5] To the extent that Conrad argues the Step Two error is not harmless because it is unclear exactly what conditions the ALJ considered in determining Conrad's residual functional capacity at Step Four, Pl.'s Reply 3 [Doc. No. 21], the court addresses the ALJ's analysis at Step Four below.

accept it as adequate to support his conclusion, even if the record could also justify a different

conclusion." Applebee v. Berryhill, 744 F. App'x 6 (1st Cir. 2018) (unpublished) (internal

quotations omitted); see also West v. Berryhill, 2017 WL 6499834, at *1 (1st Cir. Dec. 11, 2017)

(affirming an ALJ's determination as to the residual functional capacity when "the ALJ relied

upon [claimant's] activities, evidence about his impairments and symptoms before and after the

alleged onset date, evidence that temporary situational factors contributed to heightened

symptoms around the onset date, and evidence of improvement with treatment"). "In applying

the 'substantial evidence' standard, we bear in mind that it is the province of the ALJ, not the

courts, to find facts, decide issues of credibility, draw inferences from the record, and resolve

conflicts of evidence." Applebee, 744 F. App'x at 6 (unpublished).

     1.     Subjective Complaints of Pain in Determining Residual Functional Capacity

     Conrad contends that the ALJ did not adequately consider her statements regarding her

pre-December 31, 2015 pain. Mot. Reverse 7–8 [Doc. No. 16].[6] SSR 16-3p, which requires that

ALJ consider a claimant's evidence and testimony regarding pain and its effect on their residual

functional capacity, prescribes a two-step process that the ALJ must follow: (1) determine

whether the individual has a medically determinable impairment that could reasonably be

expected to produce the individual's alleged symptoms and (ii) evaluate the intensity and

persistence of those symptoms to determine the extent to which the symptoms limit an

individual's ability to perform work-related activities for an adult or to function independently.

---

[6] Conrad incorrectly cites to SSR 96-7p as the regulation for evaluating pain. "In 2016, the SSA
issued SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016), superseding SSR 96-7p and providing
revised guidance about the factors and process by which an SSA adjudicator is instructed to
evaluate claimant credibility." Lopez v. Colvin, 2017 WL 1217111, at *10 (D. Mass. Mar. 31,
2017). Accordingly, the applicable provision for evaluating Conrad's complaints of pain is SSR
16-3p, which is properly noted in the ALJ's decision. See A.R. 22 [Doc. No. 15-2].

Soc. Sec. Ruling 16-3p: Titles II & Xvi: Evaluation of Symptoms in Disability Claims, SSR 16-3p ("SSR 16-3p") (S.S.A. Mar. 16, 2016).

"The First Circuit has held that 'in determining the weight to be given to allegations of pain . . . complaints of pain need not be precisely corroborated by objective findings, but they must be consistent with medical findings.'" Walker v. Barnhart, 2005 WL 2323169, at *18 (D. Mass. Aug. 23, 2005) (quoting Dupuis v. Sec'y Health & Human Servs., 869 F.2d 622, 623 (1st Cir. 1989)). "In determining whether an individual's symptoms will reduce his or her corresponding capacities to perform work-related activities or abilities to function independently," the ALJ may properly "consider the consistency of the individual's own statements." SSR 16-3p. In doing so, the ALJ "will compare statements an individual makes in connection with the individual's claim for disability benefits with any existing statements the individual made under other circumstances." Id.

Here, the ALJ concluded that Conrad's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not fully supported prior to November 7, 2017." A.R. 23 [Doc. No. 15-2].[7] In line with the First Circuit's holding in Dupuis, the ALJ found that "the objective medical evidence of record is not consistent with [Conrad's] allegations regarding her impairments." Id. at 24. With respect to the migraines, the ALJ noted that Conrad had previously "received treatment for her migraines by several providers after being hospitalized in 2012 [and] . . . . [Conrad] reported a significant decrease[]

---

[7] Despite disagreeing with Conrad's testimony regarding the extent of her headache pain, the ALJ diverged from the state agency medical expert's conclusion that there was "insufficient evidence to identify any severe medically determinable" impairment to find "the severe impairment of migraines." A.R. 24 [Doc. No. 15-2].

in symptoms with her treatment regimen of medications and Botox injections." A.R. 24 [Doc.
No. 15-2] (emphasis added). Specifically, "after two Botox injections . . . . [Conrad] reported that
she felt substantial[] improvement with her medication regimen . . . and Botox injections . . . .
describe[ing] that she still had daily headaches, but not the severe chronic daily migraine type
headaches." Id. at 23. "By detailing the inconsistencies in Plaintiff's statements about h[er]
symptoms and functional limitations when measured against the [] record evidence showing that
Plaintiff's . . . impairment responded well to medication, the ALJ provided a[] . . . valid reason
for h[er] credibility determination." Lopez, 2017 WL 1217111, at *11.

The ALJ further stated that Conrad's "neurological examination noted that cranial nerve I
through XII were unremarkable with a normal motor and sensory exam . . . [and] Dr. Abbott
noted a diagnosis of improved chronic daily headaches with opiate use." A.R. 23 [Doc. No. 15-
2]. "Follow-up imaging, including an October 2014 head CT showed no intracranial pathology.
A repeat head CT in September 2015 also showed no acute intracranial process." Id.

"As long as an ALJ provides at least one legally sufficient reason for his or her credibility
determination, that determination will be upheld." Lopez, 2017 WL 1217111, at *11.
Accordingly, the court finds that the ALJ properly considered Conrad's statements regarding her
pain when determining Conrad's residual functional capacity prior to December 31, 2015.

2. Insufficient Evidence to Support Residual Functional Capacity Determination

Conrad contends that the ALJ's finding that Conrad was capable of exertion at all levels
for the pre-December 31, 2015 period was not supported by sufficient evidence where "the
objective evidence shows clear diagnoses and treatment of asthma, bilateral hip pain,
mild/moderate lumbar/ cervical degenerative disc disease, history of left rotator cuff tear and
edema of the legs and feet." Mot. Reverse 8 [Doc. No. 16].

Here, Conrad's counsel "summarizes evidence in the record that []he believes supports h[is] client's argument that she is disabled. It is well settled, however, that the existence of such evidence, or, indeed, evidence contrary to the ALJ's findings, does not extinguish the substantial evidence supporting the ALJ's findings." Greene v. Astrue, 2012 WL 1248977, at *3 (D. Mass. Apr. 12, 2012) (internal quotation marks omitted). "Plaintiff must show not only the existence of evidence in the record *supporting* her position but must also demonstrate that the evidence relied on by the ALJ is either insufficient, incorrect, or both." Id. (emphasis in original); see also Hill v. Astrue, 2012 WL 5830707, at *6 (D. Mass. Nov. 15, 2012) ("While Plaintiff argues that the ALJ should have assessed [the] [p]laintiff with more severe limitations based on the medical record, it is left to an administrative law judge to resolve conflicts in the evidence and, where such determinations are supported by the record, they are to be affirmed").

At the July 6, 2020 hearing, the ALJ noted that she did not see too much dating back to pre-2015 when reviewing the records thoroughly and asked Conrad's counsel if he had "anything . . . to point out with regard to the [SSDI] application." A.R. 47 [Doc. No. 15-2]; see also A.R. 68 [Doc. No. 15-2] (ALJ noting that Conrad "had some headaches but really . . . not seeing anything at a disabling level back [in 2015]"). Conrad's counsel directed the ALJ to Conrad's Greater New Bedford Community Health medical records. Id. at 47.

The Greater New Bedford Community Health medical records show that Conrad had other impairments in addition to migraines during the pre-December 31, 2015 period. However, the existence of Conrad's other impairments does not necessarily translate to residual functional capacity limitations and Conrad has not pointed to anything in the record indicating that those other impairments would further limit her residual functional capacity. See Perez v. Colvin, 2014 WL 6905599, at *3 (D. Mass. Dec. 4, 2014) ("But Plaintiff has failed to point to any evidence

demonstrating greater limitations than those found by the ALJ"). Moreover, when asked at the hearing why she was unable to work since 2010, Conrad made no mention of any of the impairments she now argues the ALJ improperly failed to consider in determining her residual functional capacity for the pre-December 31, 2015 period. See A.R. 51 [Doc. No. 15-2]. Without more, Conrad's position that "the evidence showed treatment for other impairments as well, which considered in combination would have produced a different outcome" is conclusory. Pl.'s Mem. 4 [Doc. No. 16].

When determining Conrad's pre-December 31, 2015 residual functional capacity, the ALJ cited to the Greater New Bedford Community Health medical records and discussed Conrad's migraines, epigastric pain, and chest pain in detail, including the treatment she received for those ailments. A.R. 24 [Doc. No. 15-2]. Ultimately, the ALJ concluded that "the record does support limitations to unskilled work due to pain from [Conrad's] migraines, but does not support any exertional imitation due to her physical conditions." Id. at 24 (citing Exs. B38F, B39F, and B40F).

"There is no requirement that an ALJ discuss every bit of evidence in the record when penning his decision." Miller ex rel. K.M. v. Astrue, 2011 WL 2462473, at *11 (D. Mass. June 16, 2011). "As the First Circuit has written, '[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." Id. (quoting N.L.R.B. v. Beverly Enterprises–Massachusetts, Inc., 174 F.3d 13, 26 (1st Cir. 1999) (alterations in original)); see also Quigley v. Barnhart, 224 F.Supp.2d 357, 369 (D. Mass. 2002) ("[T]here is no explicit requirement that the ALJ make findings regarding every piece of evidence that is entitled to weight"). "The failure to mention a particular record does not evince a failure to consider it." Miller, 2011 WL 2462473, at *11. "To the contrary, the presumption is

'that the ALJ has considered all of the evidence before him.'" Id. (quoting Quigley, 224

F.Supp.2d at 369). In this case, the ALJ cited the medical records that Conrad's counsel directed

the ALJ to at the hearing when determining Conrad's residual functional capacity and "[b]ased

on the record as a whole, including all of [Conrad's] impairments, both singly and in

combination," determined her pre-December 31, 2015 residual functional capacity. A.R. 24

[Doc. No. 15-2].

Accordingly, the court finds that sufficient evidence exists for the ALJ's determination as

to Conrad's pre-December 31, 2015 residual functional capacity.[8]

### 3.     Consideration of Absenteeism

Conrad further contends that her residual functional capacity determination was not

appropriately limited because the ALJ did not address that Conrad's migraines (and other

impairments) would cause absenteeism that would limit her ability to retain full time

employment. Pl.'s Mem. 8–9 [Doc. No. 16]; Pl.'s Reply 4 [Doc. No. 21]. The Commissioner

asserts that the ALJ was not required to address absenteeism on this record. Def.'s Mem. 10

[Doc. No. 20].

Both parties focus on Sacilowski v. Saul, 959 F.3d 431 (1st Cir. 2020) and Lopez-Lopez

v. Colvin, 138 F.Supp.3d 96 (D. Mass. 2015) to further their respective arguments, and so the

---

[8] To the extent that Conrad argues that the ALJ improperly gave partial weight to the state
agency examiner because "it is unclear what records the state agency examiner reviewed in
making [the] conclusion," this argument fails. Where medical records were available, the state
agency examiner cited to them and where records were unavailable or insufficient to make a
determination as of December 31, 2015, the state agency examiner stated so. See Ex. B6A, A.R.
117–133 [Doc. No. 15-3]. "[I]n this circuit, it is not reversible error for an ALJ's failure to
recontact Plaintiff's doctors to obtain more information, particularly where, as here, she was
represented by counsel at the hearing and counsel agreed that the record was complete." Smith v.
Berryhill, 370 F.Supp.3d 282, 290 (D. Mass. 2019) (citing Shaw v. Sec'y of Health and Human
Servs., 1994 WL 251000, *5 (1st Cir. 1994)).

court will start with an examination of those two cases. In Sacilowski, the First Circuit found that in the face of a doctor's findings that the claimant would need to lie down for two to four hours in an eight hour-day and miss more than four days of work a month, coupled with vocational expert testimony that regular absences of even once a month would likely preclude full-time competitive employment, the Commissioner did not provide any "contrary evidence" to warrant not addressing the issue of absenteeism. Sacilowski, 959 F.3d at 434–36, 439. In Lopez-Lopez, the district court remanded the case because "not only was there evidence from treating sources that [went] to the issue of absenteeism, but the vocational expert testified that a person who would 'experience over the course of a year an absentee rate of approximately 12 to 24 absences from the workplace' would not be able to work." Lopez-Lopez v. Colvin, 138 F.Supp.3d 96, 113 (D. Mass.), on reconsideration in part, 144 F.Supp.3d 260 (D. Mass. 2015).

Sacilowski and Lopez-Lopez both support the proposition that when the evidence in the record implicates absenteeism, the ALJ must consider the issue. See Rosario Mercado v. Saul, 2020 WL 2735980 at, *10 (D. Mass. May 26, 2020) (interpreting Lopez-Lopez as "establish[ing] that an ALJ must address the absenteeism issue"). This is so because consistent absenteeism can preclude a claimant from retaining full-time employment. See Sacilowski, 959 F.3d at 439. Failure to consider and include evidence of absences can also render the ALJ's hypothetical presented to the vocational expert inaccurate, and therefore of "diminished relevance." See Walker, 2005 WL 2323169 at, *18.

The question before the court is whether the evidence for the pre-December 31, 2015 period required the ALJ to consider absenteeism in this case. Conrad contends that her "multiple hospital visits" that were sometimes "up to twice monthly" and "migraines of two or more per week, each lasting at least four hours" sufficiently raised the issue of absenteeism to require the

22

ALJ's consideration. Pl.'s Mem. 8 [Doc. No. 16]. Defendant argues that <u>Sacilowski</u> and <u>Lopez-Lopez</u> are distinguishable because those two cases "involved treating physicians opinions finding that the claimant would miss workdays due to her impairments and/or treatment," and that "[w]ith respect to [Conrad's] visits to the emergency room in 2015 . . . no doctor (or medical source) has said that these would have compelled absenteeism limitation in the [residual functional capacity]." Def.'s Mem. 10 [Doc. No. 20].

However, in <u>Lopez-Lopez</u>, the court did not point to an explicit medical opinion on the claimant's absenteeism but instead noted that "there was evidence from treating sources that <u>goes to the issue</u> of absenteeism[.]" <u>Lopez-Lopez</u>, 138 F.Supp.3d at 113 (emphasis added). Such evidence included "psychiatric hospitalizations," "episodes of decompensation," and "emergency room treatments." <u>Id.</u> In <u>Sacilowski</u>, the First Circuit did not rely exclusively on a doctor's opinion regarding the claimant's absenteeism, but on a review of "the full record," from which the First Circuit found that "the severity and frequency of [the claimant's] migraine headaches and bladder ailments would have caused her to be absent from work at least once a month during the [r]elevant [t]ime [p]eriod, which according to the [vocational expert's] testimony, would have precluded full-time competitive employment." <u>Sacilowski</u>, 959 F.3d at 441. In rejecting the defendant's argument that the claimant's migraines were not debilitating because records show that Botox injections reduced the frequency of claimant's migraines, the First Circuit noted that the record "does not provide any evidence that a reduction in frequency mitigated the severity of the migraines, nor their debilitating effects." <u>Id.</u> at 439.

In Conrad's case, the medical record does not raise concerns of absenteeism as starkly as the record in <u>Lopez-Lopez</u> where Conrad did not undergo psychiatric hospitalizations or episodes of decompensation. The record here is also dissimilar to that in <u>Sacilowski</u> where no

doctor found that Conrad would need to lie down for several hours during the workday or miss near a handful of workdays a month. Furthermore, unlike in Sacilowski, the record here contains more evidence—albeit at times conflicting based on Conrad's own statements—as to what extent the Botox injections (and other treatments) alleviated the debilitating effects of Conrad's migraines.[9]

But while a review of Conrad's medical record may or may not result in the conclusion that absenteeism would need to be taken into account in determining her residual functional capacity, the medical record is sufficient to require the ALJ (rather than this court) to resolve that issue. See Miller, 2011 WL 2462473, at *11 ("And, of course, the applicable standard bears repetition: 'It is the responsibility of the Secretary to determine issues of credibility and to draw inferences from the record evidence. Indeed, the resolution of conflicts in the evidence is for the

---

[9] The court reviews the record briefly to illustrate the conflicting evidence. On April 8, 2014, a doctor indicated that Conrad's headaches had "substantially improved" after Botox injections and other medications. A.R. 1740 [Doc. No. 15-11]. On September 16, 2014, Conrad reported experiencing fourteen headaches in the previous month, lasting longer than four hours, and one continuous headache for the previous nine days. A.R. 1390 [Doc. No. 15-10]. At that visit, Conrad reported that she had not gone to the emergency room since starting the Botox injections. Id. However, at her November 7, 2014 visit Conrad reported that she had gone to the emergency department for headaches once in September and twice in October. Id. at 1392. While at her February and March 2015 visits Conrad reported not responding as well to the latest round of Botox injections, she indicated that stress at home may be a "contributing factor to the injections not helping as much as they normally do." Id. at 1395; see also id. at 1398 (reporting headaches were "gradually worsening" but "continues with a lot of stress at home which she feels is a contributing factor to her headaches and not receiving as great a benefit as normal with the last injections"). At her May 27, 2015 visit, Conrad reported that she "overall [was] pleased with cranial botox- HA intensity has decreased by 50%." Id. at 1401–02. However, she also reported going to the emergency room for headaches five times over the previous two months. Id. at 1402. At the August 12, 2015 visit, Conrad reported that headache "intensity and days ha[d] improved." Id. at 1408. However, on November 24, 2015, Conrad reported that she had been to the emergency room three times in the past two months due to migraines. Id. at 1412. The physician assistant's note stated that they felt the "multiple ER visits" were "more related to stress." Id.

Secretary, not the courts.'" (quoting <u>Irlanda Ortiz v. Sec'y of Health & Human Servs.</u>, 955 F.2d 765, 769 (1st Cir. 1991)). However, based on the record before it the court cannot discern whether or not the ALJ considered the number and frequency of Conrad's hospital and doctor's visits, or Conrad's testimony related to the migraines, as it pertains to absenteeism for the pre-December 31, 2015 period.[10]

Accordingly, the court remands the action for the ALJ to consider the issue of absenteeism when determining Conrad's residual functional capacity prior to December 31, 2015.

C.    *Step Five – Existing Jobs*

At Step Five, the ALJ found that from January 1, 2013, through December 31, 2015, and considering Conrad's age, education, work experience, and residual functional capacity, "there were jobs that existed in significant numbers in the national economy," that Conrad could have performed. A.R. 29 [Doc. No. 15-2].

Conrad contends that the hypothetical responded to by the vocational expert was incomplete because it did not accurately describe her impairments. Pl.'s Mot. 9–10 [Doc. No.

---

[10] Conrad contends that the ALJ's finding that her "symptoms and limitations are consistent with medical evidence and other evidence in the record" for the post-November 7, 2017 period but not the pre-December 31, 2015 period is rationally inconsistent where the ALJ noted that Conrad "continued to undergo Botox injections for her chronic migraines every three to four months" post-November 7, 2017. Pl.'s Reply 4 [Doc. No. 21]. However, the ALJ's finding as to Conrad's limitations for the post-November 7, 2017 period was not predicated on Conrad's migraines alone. <u>See</u> A.R. 25 [Doc. No. 15-2]. Conrad asserted that she was unable to work due to "several medical conditions," including "pain in both of her hands and from migraine headaches," as well as "worsening anxiety and depression as she lost more use of her hands." <u>Id.</u> The ALJ relied upon those several conditions to find that the medical evidence was consistent with Conrad's allegations regarding her limitations with respect to work. <u>Id.</u> Specifically, the ALJ found the issue of absenteeism relevant for Conrad's residual functional capacity determination post-November 7, 2017, "due to the combination of her physical and mental impairments." <u>Id.</u> at 27.

16].[11] "For a vocational expert's opinion to constitute substantial evidence, the testimony regarding an individual's ability to perform jobs in the national economy must come in response to a hypothetical question that accurately describes the claimant's impairments." Johnson v. Colvin, 204 F.Supp.3d 396, 415 (D. Mass. 2016) (citing Arocho v. Sec'y. of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982)). "Where a hypothetical omits 'any mention of a [claimant's] significant functional limitation' that is supported by the medical evidence, an ALJ cannot rely on the vocational expert's response." Id. (quoting Rose v. Shalala, 34 F.3d 13, 19 (1st Cir. 1994)). "Simply put, 'the hypothetical posed to a [vocational] expert must include all of the claimant's relevant impairments.'" Id. (quoting Aho v. Comm'r of Soc. Sec. Admin., 2011 WL 3511518, at *7 (D. Mass. Aug. 10, 2011)). "Conversely, although an ALJ must comprehensively describe the claimant's limitations in the hypothetical question, she is not required to include limitations found not credible or not supported by the evidence." Id. As discussed above, the record does not show that the ALJ considered the issue of absenteeism for the pre-December 31, 2015 period and, as a result, the court cannot make a finding that the ALJ's residual functional capacity determination prior to December 31, 2015 is proper.

Accordingly, the court finds that whether the hypothetical provided by the ALJ for the pre-December 31, 2015 period was complete such that the ALJ could rely upon the vocational expert's response in concluding whether Conrad was disabled depends on the ALJ's determination on remand as to the issue of absenteeism for the pre-December 31, 2015 period.

---

[11] While Conrad does not specify what additional limitations should have been included in the hypothetical, presumably Conrad contends that pain-related exertional limitations and limitations regarding absenteeism were improperly omitted.

**VI.     Conclusion**

For the aforementioned reasons, Conrad's <u>Motion to Reverse the Decision of the</u> <u>Commissioner</u> [Doc. No. 16] is GRANTED IN PART and DENIED in PART and Defendant's <u>Motion to Affirm the Commissioner's Decision</u> [Doc. No. 19] is DENIED. The action is REMANDED for further consideration of the issue of absenteeism with respect to the pre-December 31, 2015 period.

IT IS SO ORDERED.

Dated: March 31, 2023                                    /s/ Indira Talwani
                                                                    United States District Judge